IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| WILMA E. COOK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:14cv92-TFM |
| | ) | (WO) |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I. PROCEDURAL HISTORY

The plaintiff, Wilma E. Cook ("Cook"), applied for disability benefits pursuant to

Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*., and for supplemental security

income benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.*,

on October 18, 2011, alleging that she is unable to work because of a disability.  Cook's

application was denied at the initial administrative level.  Cook then requested and received

a hearing before an Administrative Law Judge ("ALJ").   Following the hearing, the ALJ

determined that Cook is not disabled.  The Appeals Council rejected a subsequent request

for review.  The ALJ's decision consequently became the final decision of the Commissioner

of Social Security ("Commissioner").[1]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir.

1986).   The parties have consented to the undersigned United States Magistrate Judge

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social
Security matters were transferred to the Commissioner of Social Security.

rendering a final judgment in this lawsuit.  The court has jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner is due to be REVERSED and REMANDED.

## II.  STANDARD OF REVIEW

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

To make this determination,[3] the Commissioner employs a five-step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

---

[2] Title 42 U.S.C. §§ 405(g) and 1383(c)(3) allow a plaintiff to appeal a final decision of the Commissioner to the district court in the district in which the plaintiff resides.

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A reviewing court may not look only to those parts of the record which support the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179 (11th Cir. 1986).

> [The court must] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

### III. INTRODUCTION

#### A. The Commissioner's Decision

Cook was 46 years old at the hearing before the ALJ, has completed the twelfth grade, and has a two-year degree in Cosmetology from Opelika State Technical College. R. 32, 43, 48-49. She was also certified as a nurse's assistant. R. 56.

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

Cook alleges that she became disabled on July 7, 2011, due to depression, memory loss, personality disorder, fibromyalgia, degenerative disc disease, osteoarthritis, non-obstructive coronary artery disease, mitral valve prolapse with mild mitral regurgitation, mood disorder, sleep dysfunction, hypertension, scoliosis, acid reflux disease, otitis media, chronic sinusitis, fatigue, hearing loss, migraine headaches, restless leg syndrome, neuropathy, and cystitis. R. 53-54, 57-59, 61-63. After the hearing, the ALJ found that Cook suffers from severe impairments of major depression, recurrent, moderate, chronic; personality disorder, not otherwise specified; fibromyalgia syndrome/fibrositis; cervical degenerative disc disease; possible osteoarthritis, knees; nonobstructive coronary artery disease; hypertension; mitral valve prolapse with mild mitral regurgitation; myocardial bridge; mood disorder, not otherwise specified; and mild obesity. R. 14. He also found that she suffers from non-severe impairments of sleep dysfunction associated with sleep stage-arousal; cystitis; status post cholecystectomy; mild levoscoliosis; acid reflux disease; bilateral otitis media and sensorineural hearing loss; chronic maxillary sinusitis; fatigue and malaise; irritable bowel syndrome; a condition requiring progressive lenses; plantar fasciitis; upper respiratory infection; migraine headaches; and restless leg syndrome. R. 15. The ALJ found that Cook is unable to perform her past relevant work, but that she retains the residual functional capacity ("RFC") to perform light work. R. 19. Testimony from a vocational expert led the ALJ to conclude that a significant number of jobs exists in the national economy that Cook could perform, including work as a laundry sorter, folder, or electrical assembler. R. 33. Accordingly, the ALJ concluded that Cook is not disabled. *Id.*

4

## IV.  DISCUSSION

The sole issue before the court is whether "the Administrative Law Judge committed reversible error when he substituted his own judgment for the judgment of the medical and/or psychological professionals."  Doc. No. 12, p. 1.  Specifically, Cook asserts that the ALJ improperly discounted the opinion of Dr. Peggy Thornton, a licensed consultative psychologist.  In addition, she argues the ALJ substituted his judgment for that of mental health professionals by ignoring and/or mis-characterizing their notes and findings.  The court agrees.

The mental health records indicate that Cook has received extensive mental health treatment, including frequent home visits by a case manager, monthly sessions with a counselor, and routine checkups by psychiatrists at Cheaha Regional Mental Health Center throughout the relevant time period. R. 617-618. On January 11, 2010, a mental health therapist, Katherine Smith, conducted an initial assessment of Cook, noting that Cook was emotionally and physically abused by her second husband. R. 435.  Cook reported that she has trouble hearing out of her left ear since her former husband hit the back of her head.  *Id.* She also reported that she is stressed, upset, worries all the time ,and that she stays to herself to keep from hurting others' feelings. R. 436.  In addition, she stated that she suffers from back and knee pain.  *Id.*  Cook was diagnosed as suffering from major depression, recurrent, moderate, chronic; personality disorder, NOS; and "problems [with] primary support, access to health services, economic." R. 434.  Her affect was restricted, mood was anxious, and her judgment and insight were average.  *Id.*  The therapist formulated three treatment goals for

Cook to pursue over the next year.  The first and primary goal was to maintain medication compliance to improve mood and prevent hospitalizations.  R. 439.  The second goal was to pursue disability benefits, and the third and final goal was to maintain interests.  R. 438. Throughout the year, the therapist conducted routine mental sessions with Cook.  The therapist discussed Cook's progress and provided support and encouragement, guidance concerning her self worth and esteem, and emphasized problem solving in adapting to her illness.  R. 441-446.

On January 3, 2011, the therapist formulated a new master treatment plan for the following year.  The therapist determined Cook's first goal should be to maintain medication compliance to improve mood and prevent hospitalizations, specifically noting that a barrier to reaching this goal is the cost and side effects of medication.  R. 449.  Her second goal was to acquire disability benefits, and her third goal was to manage depression.  R. 448.  Cook attended mental health sessions with the therapist on a routine basis throughout the year.  R. 450-454.  The therapist offered support and encouragement, provided guidance concerning self-esteem, and emphasized problem solving.  *Id.*  On several occasions, the therapist noted Cook's mood was irritable and/or dysphoric.  *Id.*

In December 2011, Dr. Thornton, the consultative psychologist, conducted a comprehensive psychological evaluation.  R. 507-08.  Dr. Thornton noted that Cook's medications include Lyrica, Ambien, Requip, Tribenzor, Hyoscyamine, Ultram, Zolpidem Tartrate, Naproxen, Flexeril, Percocet, Savella, Celexa, Atenolol, Tylenol, and Celebrex. R. 507.  Cook reported that her mother visits once a day and does all the cooking and

6

cleaning, that her concentration problems prevent her from doing chores and managing her finances, that she avoids social activities, and that she is so depressed sometimes that she avoids bathing and brushing her teeth. R. 507. Dr. Thornton found that Cook was "fairly neatly dressed and groomed," although her hair was uncombed, and that her presentation was initially irritable. *Id*. The psychologist also noted the following:

> [C]onsiderable confusion was evident. For example, when asked who the current president is, she was unable to name him, but insisted multiple times that "Herman Cain will be the next one!" . . . She was fully oriented as to person, place, time and situation. Her thought processes were logical. She reported depressive symptoms of frequent crying spells, feeling helpless and hopeless, low energy, [and] concentration problems, saying "I stay confused all the time." . . . She reported she hears voices calling her name and believes that people are in her house trying to scare her.

R. 507-08. Dr. Thornton conducted a cognitive functioning evaluation and found that Cook's short-term memory was impaired and long-term memory was mildly impaired. R. 508. The psychologist found that Cook would not be able to manage benefits or make appropriate work decisions "due to her evident confusion" and diagnosed her as suffering from major depressive disorder, moderate, with psychosis. *Id*.

On January 3, 2012, a therapist at Cheaha Regional Mental Health Center formulated a new master treatment plan for Cook. R. 606. The therapist, Cyrilla Beveridge, formulated three goals: (1) maintain medical compliance to improve mood and prevent hospitalizations; (2) accept referral to case management and BLS services; and (3) manage her depression.

R. 606-07.  The therapist listed Cook's diagnoses as Major Depression, recurrent, moderate, chronic; Personality Disorder, NOS; history of fibromyalgia, high blood pressure, arthritis; and problems with primary support, access to health services, and economic limitations.  *Id.*

On March 6, 2012, the therapist noted that Cook "appear[ed] depressed in her affect and demeanor," that her mood was dysphoric, and that she reported chronic pain. (R. 612). The therapist provided supportive recovery based treatment and discussed the importance of staying active and "not avoiding stressful situations because that only creates more stress." *Id.*   She also referred Cook to a case management and basic life support program, specifically noting that Cook "has multiple medical problems and is in [third] appeal process for SSI/SSP," that she "may lose her medical coverage," and that she "is feeling overwhelmed."  R. 611.

During a home visit on March 19, 2012, Christine Higgins, a case manager provided training on community awareness, money management, and communication and/or social skills.  R. 613.  Ms. Higgins noted Cook's concern that her Medicaid benefits would be terminated.  *Id.*  The case manager indicated that supervision was required and that progress was made.  *Id.*  On April 18, 2012, the case manager returned to Cook's home.  R. 615. Cook received thirty minutes of training on housekeeping skills and thirty minutes of training on medication management.  *Id.*  She noted that Cook took out the trash to the curb and thawed a package of meat in cold water.  *Id.*  The case manager again noted that supervision was required but that progress was made.  *Id.*

On May 16, 2012, both the case manager and therapist conducted a home visit.  The

8

case manager and therapist found that Cook was compliant with her medication regimen.  R. 616.  In addition, the case manager noted that Cook was recently diagnosed with hearing loss and was very depressed about the situation.  *Id.*

Cook also received at least three fifteen-minute evaluations by mental health practitioners at Cheaha Regional Mental Health Center in 2012.  On January 5, 2012, Dr. Castro, a psychiatrist, conducted a "physician medical assessment" in which he noted that Cook was very depressed and her affect was restricted.  *Id.*  His diagnostic impression was Mood Disorder, NOS.[5]  R. 610.  During an additional session on April 5, 2012, the psychiatrist diagnosed Cook as suffering from a Mood Disorder, NOS, specifically noting that Cook "seems so-so."[6]  R. 614.  On August 2, 2012, Dr. Castro diagnosed Cook as suffering from a mood disorder on Axis I and "dependent" on Axis II.  R. 689.  He recommended that she continue her present course of treatment and follow-up with her primary therapist.  *Id.*

On October 10, 2012, the case manager completed a State of Alabama Department of Mental Health and Retardation Utilization and Need Face Sheet.  R. 693.  The case manager indicates Cook was diagnosed as suffering from Major Depression on Axis I and Personality Disorder NOS on Axis II.  *Id.*  She circled items indicating that Cook is "seriously mentally ill" because she "is unemployed, is employed in a shelter setting, or has markedly limited

---

[5] It appears Dr. Castro diagnosed Cook with an additional mental health condition; however, the psychiatrist's handwriting is illegible.

[6] As previously discussed, Dr. Castro listed an additional mental health condition.  The court, however, is unable to discern the second diagnosis.

9

skills and a poor work history [and] shows severe inability to establish or maintain personal social support systems" and that she is "high risk" because she is "a person who without outpatient intervention would become at imminent risk of needing inpatient hospitalization." *Id*. The case manager also listed several unmet needs and problem areas, including Cook's difficulty with social interaction, shopping, cooking, home and money management, communication, assertiveness, community services, vocational skills, medical and dental care, inadequate income, obtaining groceries or food stamps, and routinely taking medication. R. 695. She also indicated Cook's mental health needs include "memory deficit, disoriented, or wandering" and that she "is constantly forgetting where things are." R. 696.

On October 12, 2012, the therapist at Cheaha Mental Health Center formulated an individualized case plan with four specific goals. The first goal was to "access psychiatric services" by "encourag[ing] consumer to comply with [mental health appointments] as scheduled," "stress[ing] the importance of taking med[ications] as prescribed and encourag[ing] client to follow treatment recommended for stability," "assist[ing] [client] [with] accessing med[ication] as needed," and "monitor[ing] consumer's attendance [with mental health treatment]." R. 692. The second goal was to access transportation services. *Id*. The third goal was to "access entitlements" by "assist[ing] consumer as needed in applying for all eligible benefits" and "provid[ing] social support on consumer's behalf as needed in qualifying for services." *Id*. The final goal was to "provide follow-up services" by "monitor[ing] consumer's progress according to current stage and assist[ing] as needed

for continued community living." *Id.*

On January 3, 2013, the therapist formulated a new master treatment plan for the year. R. 676-77.  The therapist determined Cook's first goal should be to maintain medication compliance to improve mood a regain motivation to work toward goals and her second goal should be to work actively and in cooperation with the case manager/BLS to improve her quality of life.  R. 676.  The therapist approved a diagnosis of major depression, recurrent, moderate, chronic; history of fibromyalgia, high blood pressure, arthritis; and limited support with stress associated with health issues.  R. 678.  When discussing her long term recovery goals, Cook indicated her hopes for a disability check and a better place to live and expressed her thankfulness for having a case manager.  *Id.*  The therapist noted that Cook has feelings of sadness, hopelessness, a loss of interests, worry, and problems sleeping, and that she "reports staying to herself because she will hurt others feelings." *Id.*

During a one-hour session on February 14, 2013, the therapist noted that Cook's mood was dysphoric and that "she has been struggling with helping to take care of her mother who is recovering from extensive surgery and rehabilitation." R. 741.  She also found that Cook was making good progress with taking her medications as prescribed without reports of side effects. *Id.*

On March 4, 2013, both the case manager and therapist conducted a home visit to monitor Cook's progress with her medication regimen.  R. 682.  Cook reported that she was not taking her medications as directed and that she had not heard anything from the Social Security office.  *Id.*  They returned to Cook's house on March 11, 2013. R. 683.  The

therapist noted that Cook's medications were well organized.  *Id*.  During the home visit, Cook asked the therapist and case manager to assist her with a four-page questionnaire from her lawyer and that she was "very helpful with dates and times and ... her work record since she applied for disability."  *Id*.  Cook also gave them a letter from the Health Department which indicated she would no longer receive Medicaid after March 31, 2013.  *Id*.

During a home visit from both the case manager and therapist on March 13, 2013, Cook gave them a letter from her lawyer which she believed contained information indicating a disability check would arrive soon.  R. 684.  Upon re-reading the letter, Cook realized that she was incorrect.  *Id*.  She reported "that she could only think about the possibility of an income."  *Id*.  Both the case manager and therapist returned to Cook's home on March 25, 2013.  R. 685.  Cook reported that she had taken all of her medication as directed and that she "is mentally alright."  *Id*.  During the visit, Cook's right leg and knee were aching and swollen.  *Id*.  Cook indicated her Medicaid benefits would end soon.  *Id*.

In 2013, Cook also received at least two brief evaluations by Dr. Castro.  During a four-minute evaluation on January 3, 2013, the psychiatrist noted that Cook was "stressed" and that her medication is helpful.  R. 688.  Dr. Castro diagnosed her as suffering from an adjustment disorder.  *Id*.  During a seven-minute evaluation on April 4, 2013, the psychiatrist noted that Cook's affect was restricted, that her condition was "fair," that she was still hurting a lot, that she had "severe stressors," and that her medication is helpful.  R. 687.  Dr. Castro again diagnosed Cook with an adjustment disorder and recommended that she continue on her present course of treatment and follow-up with her primary therapist.  *Id*.

12

On April 10, 2013, both the case manager and therapist at Cheaha Mental Health Center formulated an individualized case plan with four specific goals: (1) access psychiatric services; (2) access transportation services; (3) access entitlements; and (4) provide follow-up services. R. 697. The case manager also completed an additional State of Alabama Department of Mental Health and Mental Retardation Form indicating that Cook was diagnosed with Major Depression on Axis I and Personality Disorder NOS on Axis II. R. 698. She also circled items indicating that Cook is "seriously mentally ill" because she "is unemployed, is employed in a shelter setting, or has markedly limited skills and a poor work history [and ] shows severe inability to establish or maintain personal social support systems" and that she is "high risk" because she is "a person who without outpatient intervention would become at imminent risk of needing inpatient hospitalization." *Id*. The case manager also listed several unmet needs and problem areas, including Cook's difficulty with social interaction, shopping, cooking, home and money management, communication skills, community services, and vocational skills. R. 700. She also indicated that Cook has difficulty obtaining food, groceries, and medical/dental care, has an inadequate income, is not always compliant with psychotropic medications, and suffers from "memory deficit, disoriented, or wandering," including a tendency to forget information. R. 701.

During a session on April 29, 2013, the therapist noted that Cook's mood was dysphoric, her affect was restricted, that she may "have to wait for Medicare for 2 years to help her assist with the cost of medication," and that she "is only taking blood pressure medications and is not able to afford to fill her prescription from Dr. Castro." R. 729. The

13

therapist and case manager conferred with Cook about other cost-effective alternatives. *Id.* The following day, the case manager took Cook to the Roanoke Rural Clinic to help her get some of her medications. R. 730.

On May 28, 2013, the therapist noted that Cook's mood was anxious and dysphoric and her affect was restricted. R. 732. Cook reported that her "biggest stressor is not being able to afford her medications both psychiatric and medical." R. 732. The therapist implemented "relapse prevention strategies and recovery oriented therapies, including ways to manage stressful situations as they occur as well as importance of being self sufficient." R. 732.

On July 2, 2013, both the therapist and case manager went to Cook's home to monitor her progress. R. 784. The case manager noted that Cook requested help finding affordable dental treatment. *Id.*

On July 8, 2013, the therapist noted that Cook "presented with a sad and flat affect" with reports of becoming agitated and easily frustrated. R. 733. The therapist noted that Cook was experiencing painful dental and fibromyalgia problems but was unable to afford treatment. *Id.* The therapist conducted cognitive behavioral therapy. *Id.*

On July 12, 2013, both the therapist and case manager returned to Cook's home and discussed her depression regarding her inability to afford medication. R. 785. The case manager provided Cook with instructions on how to get affordable medication through a program at Walmart. *Id.*

During a counseling session on July 16, 2013, the therapist noted that Cook's mood

14

was anxious, dysphoric, and agitated and that she was experiencing a great deal of dental pain. R. 789.  She also noted that Cook reported that she argued with her boyfriend frequently and that she was doing a good job of making an effort to be more active.  *Id*.  The therapist implemented cognitive behavioral therapy relating to Cook's negative thought patterns and emotions. *Id*.

On August 1, 2013, a nurse at Cheaha Regional Mental Health Center conducted a thirty-minute mental health consultation.  R. 790.  She noted that Cook was compliant with her medications and that her mood was euthymic.   *Id*.   On the same day, Dr. Castro conducted a fifteen minute mental health assessment.  R. 791.  He noted that her pain and depression are present but "not as bad" and a disability hearing was set for the following week.  *Id*.  He diagnosed Cook with an adjustment disorder and recommended that she continue her present course of treatment and follow-up with her therapist.  *Id*.

On July 23, 2013, the therapist and case manager conducted a home visit to monitor her progress.  R. 786.  The case manager noted that a dentist had removed two of Cook's teeth.  *Id*.   On August 13, 2013, they returned to Cook's home and discussed her upcoming disability hearing.  R. 798.

During a one-hour consultation on August 9, 2013, the therapist noted that Cook was "in a significantly dysphoric mood" and reported that her disability hearing did not go well. R. 797.  She also "told [the therapist] for the first time that she occasionally hears voices in the distance when there is no one actually there [and she] believes it is associated to taking Perocet (narcotic pain medication) which can cause transient hallucinations."  *Id*.  The

therapist advised Cook to discuss the problem with the psychiatrist. *Id*.

On August 12, 2013, the therapist and case manager returned to Cook's home. R. 799. Cook reported that she was taking all of her medications and that she was depressed about the disability hearing and was "almost feeling like giving-up." *Id.*

During a one-hour consultation on September 6, 2013, the therapist noted that Cook's mood was dysphoric and that she presented with a depressed and somewhat hopeless mood. R. 794. The therapist noted that Cook's symptoms of irritable bowel syndrome were likely associated with anxiety. *Id.* The therapist and Cook discussed "how Cymbalta hasn't seemed to have much effect on her depression nor her pain level and she has been taking it for two years." *Id.* The therapist suggested that Cook "talk with a psychiatrist about whether or not she is on the most effective medication for her specific symptoms." *Id.*

On September 19, 2013, the case manager and therapist conducted a home visit to monitor Cook's progress with her medication regimen and determined that she was compliant. R. 800. Cook reported having constant irritable bowel syndrome and that she was worried about the social security hearing. *Id.* On October 1, 2013, the case manager and therapist returned to Cook's home. R. 801. Cook reported that she did not feel well due to her "bowels" and "stress" and expressed her concern that she had heard nothing from her lawyer. *Id.* The case manager explained that the claims remain pending for a long time. *Id.*

On October 10, 2013, Cook went to Hill Crest Associates. R. 804. Dr. Brewer, a psychiatrist, met with Cook for thirteen minutes. *Id.* The psychiatrist found no abnormalities and indicated that her mood was "ok". *Id.* He diagnosed Cook with Major Depressive

16

Disorder recurrent and increased her prescription of Cymbalta. R. 805.

On October 14, 2013, the case manager and therapist went to Cook's home to monitor her progress with medication. R. 802. They noted that she was having problems with her bowels and wearing "Depends" and that she expressed concern about the status of her social security claim. *Id*.

During a half-hour session on October 17, 2013, Karen McKinney, a therapist at Cheaha Regional Mental Health Center, noted that Cook's appearance and affect were inappropriate and her mood was dysphoric. R. 803. Cook reported that she prefers to be left alone and that her appetite is excessive. *Id*. She also stated that she "often do[es] wish[] [she] could end the hurting and aches and the pain and the lifestyle" and that she "feels like [she] is on hold due to waiting for a response from SS office for disability." *Id*. The therapist found that Cook had "some suicidal thoughts and no plan" and provided support, education, and coping skills. R. 803.

On November 7, 2013, Cook returned to Hill Crest Associates. R. 807. Dr. Brewer conducted a twelve-minute evaluation, noting that Cook's progress and response to behavioral and psychotherapeutic treatment was poorly controlled. *Id*. He diagnosed Cook with Major Depressive Disorder recurrent. *Id*. Thus, Cook received mental health treatment on a routine basis throughout the relevant time period.

Despite the extensive mental health records indicating Cook sought treatment to overcome her personality disorder and other psychological problems, the ALJ discounted Dr. Thornton's finding that Cook would be unable to manage benefits or make appropriate work

17

decisions and her diagnosis that she suffers from major depressive disorder, moderate, with psychosis.  First, the ALJ's determination that Cook's primary goal during mental health treatment was to obtain social security benefits is a mischaracterization of the evidence. The records of Cook's sessions with her therapist and case manager indicate that her primary goal was to improve her mood and prevent hospitalizations and/or to access psychiatric services. R. 448-49, 606-07, 697.  The goal of acquiring disability and/or health benefits, which incidentally was formulated by the case manager and therapist and not Cook, was secondary to Cook's primary goal of improving her mood.  *Id.*

The ALJ's finding that "the claimant admitted to the therapist she was caring for her mother following her mother's surgery" is likewise a mischaracterization of the evidence. R. 28.  The mental health records indicate that, on February 14, 2013, the therapist noted that Cook "has been *struggling* with helping to take care of her mother who is recovering from extensive surgery and rehabilitation."  R. 741.  (Emphasis added).  This court cannot conclude that a claimant "struggling" to take care of a family member is in fact an able caretaker.

The ALJ also discounts both the consultative psychologist's and therapist's findings on the basis that Cook's meetings with mental health personnel were "little in the way of remarkable complaints or findings."  R. 28.  He further discounts Dr. Thornton's finding of psychosis on the basis that Cook "never presented with signs of psychosis before her providers and she conceded this point." R. 24.  First, the court notes that nothing in the record indicates that Cook made such a concession.  Rather, she speculated during the

18

hearing that the reason she did not mention hearing voices during her therapy sessions on prior occasions was because she was medicated at the time.  R. 55.  In addition, the medical records indicate that Cook takes several medications which may cause serious side effects, including confusion or other psychological problems.[7]  It is compelling that the therapist provided extensive treatment to Cook on a frequent basis throughout the relevant time period and worked closely with a case manager at Cook's residence to counsel her on treatment goals, including social interaction, communication, shopping, home and money management, and a medication regimen.  Under these circumstances, the court cannot conclude that the ALJ's discounting of the therapist's findings based on the lack of remarkable findings is supported by substantial evidence.

More importantly, nothing in the mental health records indicates that a mental health specialist such as a doctor of psychiatry or psychology other than Dr. Thornton conducted a thorough mental health evaluation of Cook.  In addition, nothing in the record indicates that anyone other than the consultative psychologist asked her whether she suffered from auditory hallucinations, confusion, or other psychotic episodes. Despite Dr. Thornton's extensive evaluation of Cook and his psychiatric expertise, the ALJ assumed that Cook mislead the consultant into believing that she was confused during the session. By discounting Dr. Thornton's diagnosis of major depressive disorder moderate with psychosis and her finding that Cook would be unable to manage benefits or make appropriate work decisions, the ALJ

---

[7] The medication records indicate that Cook was routinely prescribed Cymbalta, Ambien, Neurontin, Requip, Lyrica, Ultram, Flexeril, Percocet, Hydrochlorothiazide, as well as other medications, and that these pills or tablets were prescribed to be taken together on a daily or as-needed basis.  R. 619-623.

substituted his judgment for that of the consultative psychologist. While the ALJ is entitled to make credibility determinations, the ALJ may not substitute his judgment for the judgments of experts in their field of expertise. Psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment. *See Hill v. Astrue*, No. 1:09cv01-CSC, 2010 WL 1533121, *4 (M.D. Ala. April 15, 2010). Consequently, on remand, the ALJ should consider whether further developing the record by ordering psychological testing and/or a thorough evaluation by a mental health specialist to determine the basis of Cook's mental health problems, including confusion, would assist him in forming a decision.

Finally, the court concludes that the Commissioner failed to consider Cook's inability to afford medical treatment when determining that Cook has the residual functional capacity to return to her perform light work. The ALJ discredited Cook's allegations of disabling symptoms based on her admission to her therapist that she was not taking her medication as directed. While failure to seek treatment is a legitimate basis to discredit the testimony of a claimant, it is the law in this circuit that poverty excuses non-compliance with prescribed medical treatment or the failure to seek treatment. *Dawkins v. Bowen*, 848 F.2d 1211 (11th Cir. 1988). The medical records are replete with references to Cook's inability to afford treatment. R. 449,611,613, 683, 729-30, 732-33, 785. In addition, Cook testified that the reason she is not taking the medication as directed is because of finances. R. 79. Despite notations indicating Cook is uninsured and is unable to afford treatment, the Commissioner failed to consider whether Cook's financial condition prevented her from seeking medical

20

treatment.  Thus, this court cannot conclude that the Commissioner's discrediting of Cook based on her failure to seek treatment is supported by substantial evidence.

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 110-111 (2000).

> The SSA is perhaps the best example of an agency that is not based to a significant extent on the judicial model of decisionmaking.  It has replaced normal adversary procedure with an investigatory model, where it is the duty of the ALJ to investigate the facts and develop the arguments both for and against granting benefits; review by the Appeals Council is similarly broad. *Id*.  The regulations also make the nature of the SSA proceedings quite clear. They expressly provide that the SSA "conducts the administrative review process in an informal, nonadversary manner."  20 C.F.R. § 404.900(b).

*Crawford & Co. v. Apfel*, 235 F.3d 1298, 1304 (11th Cir. 2000).

For these reasons, the court concludes that the Commissioner erred as a matter of law, and that the case should be remanded for further proceedings.

## VI.  CONCLUSION

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate order will be entered.

Done this 24th day of December, 2014.


_____/s/Terry F. Moorer_____
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

21